IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CRAIG E. ZINN, | CASE NO. 1:23-cv-30 |
| Plaintiff, | DISTRICT JUDGE SARA LIOI |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Craig Zinn filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In July 2020, Zinn filed an application for Supplemental Security Income alleging a disability onset date of July 2, 2020,[1] and claiming he was disabled due to depression; memory loss; severe back, legs, and knee pain;

---

[1]  "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

chronic fatigue disorder; arthritis; a heart condition; and headaches. Tr. 13, 227, 246. The Social Security Administration denied Zinn's application and his motion for reconsideration. Tr. 109, 120. Zinn then requested a hearing before an Administrative Law Judge (ALJ). Tr. 139.

In December 2021, an ALJ held a hearing. Zinn and a vocational expert testified. Tr. 41–73. That month, the ALJ issued a written decision finding that Zinn was not disabled. Tr. 13–35. The ALJ's decision became final on November 9, 2022, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Zinn filed this action on January 9, 2023. Doc. 1. He asserts the following assignments of error:

> 1. The ALJ erred when she failed to properly evaluate Plaintiff's migraine headaches at Step Three of the Sequential Evaluation.
>
> 2. The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.
>
> 3. The ALJ erred at Steps Four and Five of the Sequential Evaluation when contrary to Rulings 83-10 and 96-9p, she found that Plaintiff could perform work at the light level of exertion.

Doc. 9, at 1.

**Evidence**

*Personal and vocational evidence*

Zinn was born in 1968 and was 52 years old on the date he filed his application. Tr. 33. He has a high school education and no past relevant work. Tr. 33.

*Medical evidence[2]*

In October 2019, Zinn had right knee arthroscopic surgery. Tr. 334. Ten days later, Zinn saw his primary care provider to follow up for headaches and dizziness. Tr. 374. Zinn's assessments included cervical degenerative disc disease, post-concussive syndrome, chronic pain syndrome, right knee pain, and moderate recurrent major depressive disorder. Tr. 376.

In November 2019, Zinn saw Anabelle Morales Mena, M.D., for a rheumatology consult. Tr. 306. Dr. Mena assessed Zinn with osteoarthritis in multiple sites, ankylosing spondylitis at multiple sites in his spine, and "features of inflammatory arthritis." Tr. 308. She prescribed a Medrol Dosepak trial. Tr. 308.

In January 2020, Zinn returned to Dr. Mena and said that he had a bad reaction to the Medrol Dosepak—it made him "incredibly depressed" and didn't help his pain. Tr. 312. He stopped taking it after three days. Tr. 312. Zinn's

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

exam findings showed that he had an "[a]dequate gait with assistive device for balance" and had difficulty with left "single foot stance." Tr. 318.

In February 2020, Zinn saw orthopedic doctor James Walker, M.D., for a follow-up after Zinn's right knee arthroscopy. Tr. 334. Zinn said that he was "doing[] poorly" and had significant pain. Tr. 334. Dr. Walker explained that Zinn's knee was arthritic "and this is the issue." Tr. 336. Zinn's knee condition wasn't severe enough to warrant a knee replacement, so Dr. Walker recommended physical therapy and administered a Toradol injection. Tr. 334, 336.

Later that month, Zinn saw his primary care doctor and reported having bumped or hit his head twice. Tr. 367. He said that he had short-term memory issues. Tr. 367.

In mid-May 2020, Zinn had a mental health counseling session and reported shoulder pain after playing a guitar for three hours the evening before the appointment. Tr. 420–21. Zinn said that his doctors prescribed three weeks of physical therapy as part of his pain management program, but Zinn felt that the process would be "too grueling and painful for him" so he decided not to do it. Tr. 421. The therapist commented that Zinn rejected additional help that the therapist had suggested. Tr. 421.

About a week later, Zinn had a telephone visit with his primary care doctor and complained of leg swelling and pain in his back, hips, and legs. Tr. 363. He also reported chronic head pressure from the base of his neck to the

4

back of his head when his blood pressure was elevated. Tr. 364. His blood pressure returned to normal when he took his daily blood pressure medication. Tr. 364. Zinn stated that he had then-recent, intermittent palpitations and anxiety. Tr. 363–64.

Two days later, Zinn saw a cardiologist for swelling in his legs, ankles, and feet. Tr. 343. On exam, Zinn had no leg swelling. Tr. 344. The doctor assessed Zinn with hypertension, palpitations, and other chest pain. Tr. 344. The doctor commented that Zinn would undergo a previously recommended stress test and have his blood pressure checked. Tr. 344.

In June 2020, Zinn saw his primary care doctor for a tick bite that occurred a few days before the visit, when Zinn was in the "woods and fields" with his new puppy or while he was cutting grass. Tr. 359. Zinn said that since his doctor had stopped previously prescribed Citalopram, his headaches were better and his chest pain "was gone." Tr. 359–60, 482. Zinn said that his depression was "doing ok" with his medications. Tr. 360.

In mid-July 2020, Zinn saw Joshua Sunshine, M.D., for a follow-up "regarding previous seizures." Tr. 388. Zinn expressed concern that a brain cyst was a tumor, and Dr. Sunshine referred him to the Brain Tumor Center for an evaluation for a possible brain tumor. Tr. 388–89. Zinn reiterated that his headaches had improved since he stopped taking Citalopram. Tr. 388. Dr. Sunshine's exam findings showed that Zinn had a normal physical exam, including muscle bulk and tone; arm and leg strength; sensation, reflexes, and

coordination; and a negative Romberg test.[3] Tr. 388. Zinn's gait was "within normal limits." Tr. 388. A brain MRI was normal and showed no change from Zinn's 2018 brain MRI. Tr. 643.

A few days later, Zinn had a telephone visit with a nurse practitioner for mental health treatment. Tr. 477. Zinn stated that he hadn't had a seizure since February 2019. Tr. 482. On exam, Zinn was fully oriented, agitated, and had fair attention and concentration. Tr. 479. His speech was loud and his language was understandable. Tr. 480. Zinn had a disorganized thought process, no loose associations, and paranoid thoughts. Tr 480. He had an average fund of knowledge, fair insight and judgment, and poor memory. Tr. 480.

In late July 2020, Zinn saw Dr. Walker for worsening right hip pain radiating to his knee. Tr. 492. Zinn's hip exam findings showed a normal range of motion and "significant pain." Tr. 492. Right hip x-rays were negative. Tr. 492. Dr. Walker thought that Zinn's hip pain stemmed from Zinn compensating for his knee pain and provided Zinn with a right knee injection. Tr. 492.

In August 2020, Zinn had a mental health appointment and had similar exam findings as his July visit. Tr. 625–26.

In October 2020, Zinn had a mental health follow-up appointment and was alert, oriented, cooperative, and attentive. Tr. 698. He had a depressed

---

[3]     A Romberg test "is a simply physical test to see if [a person] has balance problems."  *See*  https://my.clevelandclinic.org/health/diagnostics/22901-romberg-test [https://perma.cc/XMG2-6MUY].

6

mood, clear speech, a linear and logical thought process, intact memory and associations, and fair insight and judgment. Tr. 698. In November, Zinn reported an improved mood and, since starting Cymbalta, decreased pain. Tr. 704. His exam findings were the same as his October visit. Tr. 705.

In mid-December 2020, Zinn was alert, oriented, cooperative, and attentive. Tr. 788. He had a content mood, clear speech, a linear and logical thought process, intact associations and memory, and fair insight and judgment. Tr. 788. Later that month, Zinn had a counseling appointment and was cooperative and had an appropriate affect and normal speech. Tr. 756–57.

In January 2021, Zinn was alert, oriented, cooperative, and attentive. Tr. 795. He had a content mood, clear speech, a linear and logical thought process, intact associations and memory, and fair insight and judgment. Tr. 788. Zinn's February 2021 psychiatric follow-up note shows similar findings. Tr. 802.

In late February 2021, Zinn saw neurologist Sheila Rubin, M.D., for memory problems, headaches, and seizures. Tr. 854. Zinn reported that he had not had a syncopal episode[4] in two years and denied any history of convulsions. Tr. 855. Cymbalta "helped his whole body pain and depression." Tr. 855.

In early March, Zinn had a mental health appointment and was alert, oriented, cooperative, and attentive. Tr. 809. He had an irritable mood, clear

---

[4] Syncope is a temporary loss of consciousness. *See* Dorland's Illustrated Medical Dictionary, 33rd Edition, 2020, at 1788.

speech, and a linear, logical, and tangential thought process. Tr. 809. He had some loose associations, intact memory, and fair insight and judgment. Tr. 809. Zinn said that Dr. Sunshine had recommended a three-day EEG to test for brain wave abnormalities, but Zinn didn't want to do it. Tr. 808. Zinn stated that Cymbalta was helping with his pain, except for his knee pain. Tr. 807.

In late March, Zinn saw Dr. Rubin again to discuss headaches. Tr. 838. Zinn reported having migraines "for years," but said that they have decreased in frequency and occurred "periodically." Tr. 838. His most recent migraine was two weeks before the appointment. Tr. 838. Dr. Rubin opined that Zinn's migraines were not frequent enough to warrant using a migraine prophylactic medication. Tr. 839. She diagnosed Zinn with cervico-occipital neuralgia of the right side and migraine without aura and without status migrainosus, not intractable. Tr. 835. Dr. Rubin recommended an occipital trigger point injection to help with Zinn's occipital headaches, but Zinn declined. Tr. 815, 839.

In early April 2021, Zinn had a mental health appointment and had a depressed and irritable mood and some loose associations. Tr. 816. He was alert, attentive, and cooperative. Tr. 816. He had clear speech, a linear, logical, and tangential thought process, intact memory, and fair insight and judgment. Tr. 816. In early May, Zinn had a content mood and the balance of his exam findings were the same as his April visit. Tr. 824. Zinn reported that ten days

8

before the visit, he bought a new mattress and his back, hip, and knees felt better. Tr. 823.

In July 2021, Zinn told his mental health provider that he skipped his June pain management appointment. Tr. 742. He also hadn't followed up with his cardiologist or taken a stress test. Tr. 742. On exam, Zinn was alert and cooperative and had a depressed mood. Tr. 743. He had unremarkable speech, thought process, and perception; intact memory; and fair insight and judgment. Tr. 743.

In September 2021, Zinn had a mental health appointment and told the provider that his chronic pain had worsened. Tr. 724. He reported doing some housework and "lifted objects maybe 50 to 70 [pounds]." Tr. 724. On exam, Zinn was fully oriented, alert, and cooperative. Tr. 725. He had a neutral and euthymic mood,[5] unremarkable speech and perception, a goal-directed and linear thought process, intact memory, and fair insight and judgment. Tr. 725–26. The next day, Zinn had a counseling appointment. Tr. 721–22. Zinn's exam findings showed that Zinn was cooperative with unremarkable speech and perception. Tr. 722. He had a neutral mood, flat affect, and appropriate insight and judgment. Tr. 722.

About a week later, Zinn saw a pain management doctor for pain in his back, neck, hips, shoulders, and knees. Tr. 865. On exam, Zinn had "some

---

[5] A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary, at 647 (33d ed. 2020).

edema" in his ankles. Tr. 866. The doctor diagnosed cervical degenerative disc disease; chronic post-traumatic headache, not intractable; chronic fatigue; and chronic pain syndrome. Tr. 866. The doctor commented that Zinn hadn't visited pain management for a year-and-a-half. Tr. 877. The doctor prescribed a TENS unit for pain. Tr. 867.

In early October 2021, Zinn had a counseling session. Tr. 719–20. On exam, Zinn was cooperative and anxious and had unremarkable speech and perception. Tr. 720. He had a nervous mood, appropriate affect, unremarkable thought content with depressive cognitions, and appropriate insight and judgment. Tr. 720.

A few days later, Zinn saw cardiologist George Farah, M.D. Tr. 708. Dr. Farah's exam findings showed that Zinn had pitting edema in his ankles. Tr. 711. Dr. Farah referred Zinn for a stress echo because Zinn couldn't walk on the treadmill due to his knees. Tr. 711.

In late October 2021, Zinn saw Benjamin Silver, M.D., for bilateral knee pain. Tr. 887. Zinn said that he had received cortisone injections in both knees in the past but "the most recent ones" didn't "work[] very well." Tr. 887. He denied numbness, tingling, and pain shooting down his legs. Tr. 887. On exam, Zinn had knee joint tenderness and some effusion. Tr. 888. Dr. Silver reviewed Zinn's x-rays, which showed moderate degenerative disease. Tr. 888. Dr. Silver assessed bilateral knee arthritis and prescribed gel injections. Tr. 88. He also referred Zinn to a weight management clinic and pain management. Tr. 888.

In November 2021, Zinn's mental health case manager wrote a note stating that she "ha[d] provided [Zinn] transportation" and that Zinn "struggle[d] with getting in and out of the vehicle." Tr. 834. Zinn "struggle[d] with ambulating around the store for long periods and use[d] a walker/cane." Tr. 834.

*State agency opinions*[6]

In August 2020, David Knierim, M.D., reviewed Zinn's record and assessed Zinn's residual functional capacity (RFC).[7] Tr. 103–05. Dr. Knierim opined that Zinn could perform light exertional level work—he could stand and walk for six hours in an eight-hour workday, sit for six hours, and lift, carry, and pull twenty pounds occasionally and ten pounds frequently. Tr. 103–04. Zinn also had postural and environmental restrictions. Tr. 104–05. In December 2020, Elizabeth Das, M.D., affirmed Dr. Knierim's findings. Tr. 115-16.

---

[6]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[7]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

In August 2020, Janet Souder, Psy.D., reviewed Zinn's record and assessed Zinn's mental RFC. Tr. 105–07. Dr. Souder opined that Zinn could understand and remember one- to two-step instructions and carry out short or simple instructions. Tr. 106. Zinn could relate to a small group of familiar coworkers on an occasional and superficial basis but shouldn't work with the general public. Tr. 107. He could adapt to a setting in which duties are routine and predictable but couldn't adhere to strict time limits or production standards. Tr. 107. In December 2020, Karla Declour, Ph.D., affirmed Dr. Souder's findings. Tr. 116–18.

*Hearing testimony*

Zinn, who was represented by counsel, testified at the telephonic administrative hearing held in December 2021. Zinn stated that since late 2019, his pain, depression, and knee problem have "worsened considerably." Tr. 48–49. His short-term memory has "gotten dramatically worse." Tr. 48. At the time of the hearing, Zinn weighed about 320 pounds. Tr. 49. He was trying to lose weight so he could get his "knee fixed." Tr. 49. He also had pain in his head, neck, shoulders, back, right hip and leg, and sometimes his left leg. Tr. 50.

Zinn stated that after his knee surgery, he developed hip pain. Tr. 50. He experienced pain in the lower part of his body all day, every day. Tr. 50. His medications helped manage his pain. Tr. 50–51. Zinn estimated that his average pain level was a seven or eight out of ten. Tr. 51. He stated that he can

12

stand for about 20 to 30 minutes with his cane or walking stick and 10 to 15 minutes without an assistive device. Tr. 51. He can walk about 100 to 120 yards, and then he gets a cramp in his hip. Tr. 51. The pain then spreads around his leg and into his groin and lower back. Tr. 51. Lifting and carrying causes neck and shoulder pain. Tr. 52. Zinn can carry about 20 to 25 pounds. Tr. 52. Zinn's left rotator cuff is "not 100 percent" and causes problems. Tr. 53. Zinn also has issues with his left ankle. Tr. 53.

When asked about his headaches, Zinn stated that they primarily occur on the left side of his head around his eye and temple. Tr. 53. The pain travels to the back of his head and feels like a tension headache. Tr. 53. Zinn also has "full-on migraines where [he] can't be in light or any kind[] [of] noise or anything slightly loud[]," or the migraine will get worse. Tr. 53. Zinn's head has "been hurting every day … since September." Tr. 53. Zinn went through a period in July and August when he didn't have daily headaches. Tr. 53. He tries to avoid migraines "on a daily basis now." Tr. 54. He explained that it had a lot to do with "not sleeping right and the amount of pain [he's] in," which takes a toll on his nervous system. Tr. 54.

Zinn continued to have mental health treatment. Tr. 54. He had difficulty sleeping and takes Trazadone, which helped. Tr. 54–54. He also experienced daily chronic fatigue and problems concentrating. Tr. 54–55.

The ALJ asked the vocational expert to determine whether a hypothetical individual could perform work if the individual had the

13

limitations assessed in the ALJ's RFC determination, described below. Tr. 55–56. The vocational expert answered that such an individual could perform the following jobs: dealer account investigator, storage rental clerk, and merchandise marker. Tr. 57.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since July 2, 2020, the application date (20 CFR 416.971 *et seq.*).

> 2. The claimant had the following severe impairments: posttraumatic headaches and seizures disorder status-post multiple concussions, occipital neuralgia, chronic pain disorder, degenerative disc disease of the cervical and lumbar spine, ankylosing spondylitis, osteoarthritis of the right knee status-post arthroscopic surgery, obesity, bipolar disorder, posttraumatic stress disorder (PTSD), generalized anxiety disorder, and major depressive disorder. (20 CFR 416.920(c)).

> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; frequently balance; occasionally stoop, kneel, crouch, and crawl; no work in unprotected heights; no operating dangerous moving machinery or being around it, dangerous equipment defined as things such as power saws and jackhammers; can understand, remember, and apply information to

complete simple instructions; can work in a routine work environment that does not require strict production pace for time or quantity; can interact with coworkers and supervisors to engage in such work related tasks as asking questions, clarifying instructions, gathering information, serving others, and pointing/directing where items may be placed, but should avoid work with the general public, however incidental contact with the general public is acceptable, defined as passing in a hallway, while gathering objects, or on the telephone.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born [in] … 1968 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since July 2, 2020, the date the application was filed (20 CFR 416.920(g)).

Tr. 16–35.

15

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The

Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1.     The ALJ did not err when she evaluated Zinn's headaches at step three*

Zinn argues that the ALJ "failed to properly evaluate [Zinn's] migraine headaches at Step Three."[8] Doc. 9, at 8.

---

[8]     The heading of Zinn's asserted error states that the ALJ erred when she evaluated Zinn's headaches at step three. Doc. 9, at 8. Under that heading, Zinn points out that the ALJ considered whether Zinn's physical and mental impairments satisfied nine listings. *Id.*; Tr. 17–21 (ALJ's decision discussing Listings 1.15, 1.16, 1.18, 11.02, 11.18, 14.09, 12.04, 12.06, and 12.15). Zinn then asserts that, "[e]xcept for the psychological listings, the totality of the ALJ's analysis of the relevant listings was a recitation of the criteria of each. As such, her findings at Step Three of the Sequential Evaluation were defective as they were not supported by substantial evidence." Doc. 9, at 8. Zinn doesn't develop an argument about why he believes that the ALJ's evaluation of the physical

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meet or equal one of the listings in the Listing of Impairments.[9] 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker*, 93 F. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x

---

listings other than headaches aren't supported by substantial evidence or assert that he satisfied the requirements of those listings. So Zinn has forfeited any such argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted); *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (describing the difference between waiver and forfeiture).

[9]     The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id*. There is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

"Primary headache disorder is not a listed impairment," but *a primary headache disorder*, "alone or in combination with other impairment[s], [may] medically equal[] a listing." Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7 (S.S.A. Aug. 26, 2019). Listing 11.02, epilepsy, is the "most closely analogous listed impairment" for a *primary headache disorder*. *Id*. Zinn argues that he satisfies Listing 11.02B. Doc. 9, at 10. Listing 11.02B requires:

> dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7.

As an initial matter, Zinn's counsel didn't allege at the hearing that Zinn's headaches, or any other impairment, satisfied a listed impairment. Tr. 46. In fact, a prior ALJ had denied Zinn's earlier disability application and found that Zinn's headaches didn't satisfy Listing 11.02. Tr. 82–83. Zinn's attorney referenced that prior ALJ's decision at the administrative hearing in this case but didn't mention the listings. Tr. 46. Instead, counsel argued that Zinn's worsening degenerative knee condition indicated that Zinn was limited to a sedentary RFC. Tr. 46. So the ALJ was not required to discuss Listing 11.02. *See, e.g., McGeever v. Comm'r of Soc. Sec.*, No. 1:18-cv-477, 2019 WL 1428208, at *7 (N.D. Ohio March 29, 2019) ("Where the claimant does not mention the particular Listing at the hearing before the ALJ, the Sixth Circuit has found that the ALJ is not obligated to discuss that particular Listing") (collecting cases).

Nevertheless, Zinn hasn't shown that the ALJ erred when she evaluated his headaches at step three. The ALJ stated that, as to Listing 11.02, neither Zinn's seizures nor headaches satisfied that listing. Tr. 19. The ALJ explained that Zinn didn't have "dyscognitive seizures at least once a week for at least three consecutive months despite adherence to prescribed treatment." Tr. 19; *see also* 20 C.F.R Part 404, Subpart P, App. 1, Listing 11.02B; Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7.

Later in her decision, the ALJ acknowledged Zinn's testimony about his headaches. Tr. 23. The ALJ cited evidence in the record showing that in April

2020, Zinn reported that his headaches were more frequent, and that in June

and July 2020, Zinn reported that his headaches improved after he stopped

taking a medication. Tr. 24. In November 2020, Zinn mentioned having

headaches that he thought were "stress related." Tr. 24. The ALJ noted that in

March 2021, Zinn told a neurologist that he had "periodic[]" migraines and last

experienced a migraine two weeks before the appointment. Tr. 25. The ALJ

detailed the neurologist's notes from that visit recounting Zinn's reports of

headache symptoms and the different types of headaches that Zinn described.

Tr. 25. The ALJ noted that the neurologist opined that "[t]he frequency of

[Zinn's] episodic migraines did not warrant the use of a migraine prophylactic

medication." Tr. 25. The neurologist recommended that Zinn have injections

for his headaches, but Zinn didn't want them. Tr. 25. The ALJ also wrote that

a different neurologist had recommended that Zinn have an EEG, but Zinn

declined. Tr. 25. And the ALJ commented that in June 2021, Zinn reported

"ongoing head pain and headaches." Tr. 25.

The ALJ concluded:

> the claimant has the above residual functional
> capacity assessment, which is supported by the
> conservative treatment history, the longitudinal
> medical record, the claimant's statements, and the
> claimant's presentation on examination. The
> claimant's allegations are not entirely consistent
> with the evidence. The claimant had fairly minimal,
> conservative treatment history of his physical health
> issues. He often failed to follow-up with or refused
> treatment. He refused to get EEG testing or get
> trigger point injections for his headaches...

22

Tr. 32. The ALJ explained that Zinn's neurologist was skeptical of Zinn's "alleged seizure diagnosis" and Zinn's assertion that he had experienced over thirty concussions, noting that the neurologist wrote that Zinn's "story built up as he told it." Tr. 32. The ALJ's decision as a whole supports the ALJ's finding that Zinn didn't satisfy Listing 11.02B because Zinn didn't have dyscognitive seizures or headache events at least once a week for at least three consecutive months despite adherence to prescribed treatment. Tr. 19; *see Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (reversal is unwarranted when the ALJ's conclusion at step three is sufficiently supported by factual findings elsewhere in the decision).

In support of his argument, Zinn details evidence in the record that the ALJ cited, described above, showing Zinn's reports of headache symptoms. Doc. 9, at 9 (citing Tr. 24–25). Zinn then offers additional evidence in the record that is consistent with the ALJ's cited evidence.[10] Doc. 9, at 9–10 (citing Tr. 408 (April 2020 note in which Zinn told his mental health therapist that he had daily headaches and that the "only thing that help[ed]" was a "dark room with a cold pack"); Tr. 685 (July 2020 counseling note listing Zinn's medical

---

[10]    In this section of his brief, Zinn relies on evidence that he didn't include in the *Facts* section of his brief, in violation of the Court's Initial Order. *See, e.g.*, Doc. 9, at 10 (citing Tr. 836 as diagnosing Zinn with tension-type headaches and Tr. 710 as Zinn reporting headaches in October 2021) *see also* Doc. 5, at 3 ("All facts relevant to the legal issues and discussion must be set forth in the *Facts* section."). Zinn's counsel has been previously warned about this practice. *See, e.g.*, *Mencke v. Comm'r of Soc. Sec.*, Case No. 1:21-cv-2298, 2022 WL 2758577, at *1 n.2 (N.D. Ohio July 14, 2022).

problems, including "chronic headache"); Tr. 742 (July 2021 note stating, "[s]till having headaches and head pain"); Tr. 875 (January 2021 note in which a "comments" section lists "chronic post-traumatic headache" and "chronic head pressure"); Tr. 835–36 (March 2021 neurology treatment note diagnosing Zinn with cervico-occipital neuralgia of the right side and migraine without aura, not intractable, and listing a medical history of tension-type headache, not intractable); Tr. 710 (October 2021 cardiology visit in which Zinn reported headaches); Tr. 742 (July 2021 mental health appointment in which Zinn reported that he was "[s]till having headaches and head pain); Tr. 865 (September 2021 pain management record stating that Zinn was assessed with chronic post-traumatic headache, not intractable, among other diagnoses)). Zinn concludes that, "[b]ased on the evidence, [Zinn] satisfied the frequency requirement of Listing 11.02B as he had a headache averaging at least once a week for at least 3 consecutive months." Doc. 9, at 10. But the evidence Zinn cites doesn't show that he had headaches at least once a week for at least three consecutive months.

Even if it did, Zinn has to show that he had headaches at least once a week for at least three consecutive months *despite adherence to prescribed treatment*. Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7. The ALJ found that Zinn refused treatment for his headaches. Tr. 25, 32. Zinn concedes that point, but states, without further explanation or citation to evidence, that "the record indicated that he was compliant with his medication." Doc. 9, at 10. Zinn's

24

unsupported statement doesn't undercut the ALJ's finding that Zinn refused headache treatment.

Next, Zinn argues that, besides the ALJ's step three analysis, the ALJ "also erred when she failed to discuss any effects the headaches would have on [Zinn's] ability to engage in substantial gainful activity on a full-time and sustained basis." Doc. 9, at 10 (citing *Harper v. Comm'r of Soc. Sec.*, No. 1:20-cv-1304, 2021 WL 2383833, at *12 (N.D. Ohio May 25, 2021), *report and recommendation adopted*, 2021 WL 2381906 (N.D. Ohio June 10, 2021)). Zinn states, "[e]ven though the ALJ mentioned the headaches as a severe impairment, she failed to analyze [Zinn's] headaches in accordance with the appropriate Ruling." Doc. 9, at 11. Zinn doesn't state what "Ruling" he alleges that the ALJ didn't follow. Even if the Court considers Zinn's misplaced argument,[11] it fails. In *Harper*, the court found that the ALJ erred because the ALJ didn't evaluate the claimant's reports of migraine symptoms, the effectiveness of treatment, and the limiting effects of the claimant's migraines. *Harper*, 2021 WL 2383833, at *12–13. Here, the ALJ evaluated Zinn's reports

---

[11] Zinn's counsel has been warned to refrain from doing what she has done here—combining together disparate challenges and arguments of the sequential disability evaluation. *See, e.g., Gottron v. Comm'r of Soc. Sec.*, No. 3:22-cv-123, 2022 WL 17717498, at *8, n. 17 (N.D. Ohio Oct. 5, 2022) (collecting cases), *report and recommendation adopted*, 2023 WL 4285132 (N.D. Ohio June 30, 2023). Counsel has been warned that if she continues to present arguments in this manner, the Court may deem an argument forfeited or impose other appropriate sanctions. *Id.*

of headache symptoms, exam findings, conservative treatment, refusal of treatment, and daily activities. Tr. 23–25, 32.

In his reply brief, Zinn for the first time argues that he satisfies Listing 11.02B because Zinn's neurologist, Dr. Rubin, provided a description of Zinn's headaches as Social Security Ruling 19-4p requires. Doc. 12, at 1–2 (citing Tr. 838). But "[a]n argument first presented to the Court in a reply brief is [forfeited]." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). In fact, Zinn didn't even discuss Dr. Rubin's narrative in the *Facts* section of his brief, as the Court's Initial Order required him to do. *See* Doc. 5, at 3.

Even if the Court entertains Zinn's argument, it fails. As the ALJ observed, Dr. Rubin stated that Zinn's periodic migraines were "episodic [and] did not warrant the use of a migraine prophylactic medication." Tr. 25, 838. As for Zinn's other headache types, Dr. Rubin wrote that Zinn refused her recommended treatment, as the ALJ also observed. Tr. 25, 32, 838. So Dr. Rubin's treatment note, which the ALJ discussed, Tr. 25, doesn't show that Zinn satisfies Listing 11.02B.

### 2. *The ALJ complied with Social Security Ruling 16-3p*

Zinn argues that the ALJ didn't comply with Social Security Ruling 16-3p when she evaluated Zinn's symptoms. Doc. 9, at 12. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See*

Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)). The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *10.

After citing Social Security Ruling 16-3p and asserting that the ALJ didn't comply with it, Zinn spends about three pages reciting evidence in the record, some of which he didn't cite or discuss in the *Facts* section of his brief in violation of the Court's Initial Order.  Doc. 9, at 12–15. After reciting the evidence, Zinn offers no conclusion and doesn't tie the evidence to a specific argument. So Zinn has forfeited any argument related to that evidence.

Next, Zinn says that the record shows "severe pain" and string-cites to 33 pages in the record, including pages he hadn't included in the *Facts* section of his brief. Doc. 9, at 15. Zinn concedes that the ALJ considered Zinn's pain "throughout her decision." *Id*. at 16. Zinn complains that because he was able to play a guitar, the ALJ didn't find credible Zinn's reports of pain. *Id*. But the ALJ didn't rely only on Zinn's guitar playing—she also cited Zinn's activities of cutting grass, spending time in the woods and with friends, walking to physical therapy appointments, doing housework, and lifting objects weighing 50 to 70 pounds. Tr. 32; *see* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *7 (ALJ considers daily activities and functional restrictions).

The ALJ also found that Zinn had "fairly minimal, conservative treatment of his physical health issues." Tr. 32; *see also* Tr. 26 (ALJ stating that Cymbalta and a new mattress helped Zinn's pain). The ALJ explained that Zinn "often failed to follow-up with or refused treatment" and that he had "intact strength in his knees and conservative care was recommended." Tr. 32; *see* Tr. 26–27 (ALJ stating that Zinn didn't go to a pain management appointment or wish to reach out to a medical provider to discuss leg swelling and detailing Zinn's exam findings). The ALJ also found that imaging "only partially supported [Zinn's] allegations." Tr. 27; *see* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *5, 7 (the ALJ considers the claimant's objective exam findings and treatment). And the ALJ found persuasive the state agency reviewers' opinions. Tr. 31; *see* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *7

(the ALJ considers the state agency reviewers' opinions). Zinn doesn't challenge those findings. He alleges that the ALJ's "[f]ailure to find that the pain would interfere with his ability to sustain concentration …, as supported by the medical evidence and testimony in this matter, was harmful." Doc. 9, at 16. But Zinn didn't allege that his pain interfered with his ability to concentrate and he doesn't cite medical evidence showing that it did. Zinn's remaining boilerplate assertions, Doc. 9, at 16–17, are not developed and are forfeited.

In short, Zinn hasn't shown that the ALJ erred when she evaluated his reports of symptoms.

### 3. The ALJ's finding that Zinn didn't need a cane is supported by substantial evidence

In his last assignment of error, Zinn contends that the ALJ "erred at steps four and five of the sequential evaluation when contrary to rulings 83-10 and 96-9p, she found that plaintiff could perform work at the light level of exertion." Doc. 9, at 18. The gist of Zinn's argument is that the ALJ erred when her RFC didn't include a limitation that Zinn needed to use a cane.

If an assistive device is "not a necessary device for [a] claimant's use, it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To be considered a restriction or limitation, an assistive device "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the [device] is medically necessary." *Murphy v. Astrue*, No. 2:11-

29

cv-114, 2013 WL 829316, at *10 (M.D. Tenn. March 6, 2013) (citations omitted). To be *medically necessary*, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a[n] [assistive device]." *Id*. (citation omitted). And there must be medical documentation "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." Soc. Sec. Ruling 96-9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996); *see Golden v. Berryhill*, No. 1:18-cv-636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("a cane prescription [that] does not indicate 'the circumstances for which [the cane] is needed,' … does not fulfil the requirements under SSR 96-9p"), *report and recommendation adopted sub nom. Golden v. Comm'r of Soc. Sec.*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019).

"If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the V[ocational] E[xpert]" which includes the use of an assistive device. *Murphy*, 2013 WL 829316, at *10 (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Generally, an ALJ's finding that an assistive device is not *medically necessary* is error when the claimant was prescribed an assistive device and the ALJ didn't include the use of the device in the RFC without providing an explanation for omitting it. *Cruz-Ridol v. Comm'r of Soc. Sec.*, No. 1:17-cv-1075, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018) (citing *Watkins v. Comm'r of Soc. Sec.*, No. 1:16–cv–2643, 2017 WL 6419350, at *11 (N.D. Ohio

Nov. 22, 2017)), *report and recommendation adopted*, 2018 WL 1083252 (N.D. Ohio Feb. 28, 2018).

Here, the ALJ found that a cane wasn't medically necessary. Tr. 27. The ALJ stated that Zinn alleged that he used a cane or walking stick any time he left the house. Tr. 23. The ALJ detailed the evidence in the record and wrote:

> [Zinn] sometimes walked with a normal gait. (Exhibit B5F, page 6; Exhibit B9F, page 28). At times, his gait was slow and antalgic,[12] but steady. (Exhibit B20F, page 23; Exhibit B21F, pages 12, 18). At times, he was using a cane or walking stick. (Exhibit B7F, page 9; Exhibit B20F, page 23; Exhibit B21F, page 18). He had a negative Romberg sign [to assess balance]. (Exhibit B5F, page 6). His coordination was intact with no ataxia and normal finger-to-nose testing. (Exhibit B5F, page 6; Exhibit B9F, page 28).

Tr. 26–27. The ALJ then concluded that the record didn't contain medical documentation establishing the need for a hand-held assistive device to aid in walking or standing and describing the circumstances for which it is needed. Tr. 27 (citing Soc. Sec. Ruling 96-9p).

Zinn asserts that "the record clearly established that [Zinn] used a cane for balance, gait, and endurance." Doc. 9, at 13 (citing Tr. 492, 717, 834, 857, 865). While the record shows that Zinn used a cane, as the ALJ observed, the evidence Zinn cites doesn't show "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing

---

[12]    An antalgic gait is an abnormal gait due to the person trying to avoid pain. *See* Dorland's Illustrated Medical Dictionary, 33rd Edition, 2020, at 96.

the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).” *See* Soc. Sec. Ruling 96-9p, 1996 WL 374185, at *7. Zinn’s record citations show that in July 2020, Zinn had full weight-bearing status and ambulated “with the use of a cane.” Tr. 492, 717.[13] In February 2021, Zinn had a “[c]asual gait with a cane [that] is antalgic, slow, but steady.” Tr. 857. In September 2021, Zinn was asked if he had difficulty walking and answered, “Yes [patient] using a cane.” Tr. 865. When asked if he had balance problems, Zinn said “yes.” Tr. 865. But the ALJ acknowledged that at times Zinn walked with a cane and that at times his gait was slow and antalgic but steady. Tr. 26. The ALJ also found that Zinn’s exam findings showed a negative Romberg sign and intact coordination. Tr. 27. The fact that Zinn was observed to walk with a cane isn’t sufficient to show that a cane was medically necessary. *See Parrish v. Berryhill*, No. 1:16-cv-1880, 2017 WL 2728394, at *12 (N.D. Ohio June 8, 2017) (“While there are some indications in the medical records that Plaintiff was using a cane, this is insufficient to establish that the cane was medically required”), *report and recommendation adopted sub nom. Parrish v. Comm’r of Soc. Sec.*, 2017 WL 2720332 (N.D. Ohio June 23, 2017).

Zinn also cites a letter that Zinn’s mental health case manager wrote. Doc. 9, at 19 (citing Tr. 834). The case manager stated that she observed Zinn

---

[13] Two of the transcript pages Zinn cites are duplicates from a visit with Dr. Walker on July 27, 2020. Tr. 492, 717.

"struggle[] with getting in and out of the vehicle" and "with ambulating around the store for long periods and uses a walker/cane." Tr. 834. The ALJ considered that letter and found that it wasn't persuasive. Tr. 32. The ALJ explained that the case manager wasn't a physical healthcare provider, the opinion "was based solely on lay observations of [Zinn]," and it was inconsistent with Zinn's conservative care and other evidence in the record. Tr. 32. Zinn doesn't dispute that the case manager's letter was based solely on her lay-person observations. So the letter isn't *medical documentation* establishing that Zinn needed a cane when walking or standing.

Because the ALJ's finding that a cane wasn't *medically necessary* is supported by substantial evidence, the ALJ wasn't required to include a cane in the RFC limitations or in her hypothetical questions to the vocational expert. *See Murphy*, 2013 WL 829316, at *10. So Zinn's related arguments about the RFC limitations and vocational expert's testimony, Doc. 9 at 20, also fail.

### Conclusion

For the reasons explained above, I recommend that the Commissioner's decision be affirmed.

Dated: September 11, 2023

        */s/ James E. Grimes Jr.*
        James E. Grimes Jr.
        U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).